1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

11 | SECURITIES AND EXCHANGE COMMISSION,   Civil Action No. _____

12 |            Plaintiff,

13 |       vs.                                              **COMPLAINT**

14 | FRANCISCO ABELLAN,
     VEGA STAR CAPITAL, SL,
15 | EU EQUITY HOLDINGS INC.,
     KLO FINANCIAL SERVICES INC.,
16 | GENE HEW-LEN,
     NXGEN HOLDINGS, INC., formerly known as
17 |      GHL TECHNOLOGIES, INC.,

18 |            Defendants,

19 |       and

20 | APOLLO CORPORATION,
     D&O INTERNATIONAL CORP.,
21 | HALSTON CAPITAL LTD.,
     INSIGHT MARKETING &
22 |      COMMUNICATIONS INC.,
     LACROIX INTERNATIONAL
23 |      HOLDINGS LTD.,
     MEDIA PACIFIC INC.,
24 | MORTENSEN FINANCIAL LTD.,
     OMNI CONSULTING SERVICES INC.,

25 |
            Relief Defendants.
26
27
28

SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA  94104
(415) 705-2500

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY OF THE ACTION

1.     The defendants in this action together executed a scheme to manipulate the public market for shares of a small company formerly known as GHL Technologies, Inc. ("GHLT"). Beginning in late 2005, defendants illegally sold millions of shares of the Bremerton, Washington, company without providing the required information about its business to potential investors.  The scheme was carried out by defendant Gene Hew-Len, GHLT's president and Chief Executive Officer, and defendant Francisco Abellan, a Spanish stock promoter, and with the substantial assistance of defendant GHLT and defendants Vega Star Capital, SL ("Vega Star"), EU Equity Holdings Inc. ("EU"), and KLO Financial Services Inc. ("KLO"), foreign companies owned and controlled by Abellan.

2.     Defendants' illegal conduct occurred in two phases.  In the first, from late 2005 to early 2006, Hew-Len and Abellan reorganized GHLT and caused it to issue nearly seven million shares of stock to Abellan's companies, which paid $500,000 to GHLT and Hew-Len.  In the reorganization of GHLT, defendants obtained a stock listing for the company which allowed public trading of the company's shares.  Defendants, however, did not provide important information about the company's business and finances to the public by registering the sale of GHLT shares to Abellan's company with the Securities and Exchange Commission (the "Commission").  Defendants illegally evaded registering the transaction by pretending that it was a private sale and that Abellan's companies intended to hold the shares as part of a long-term "investment."

3.     During the spring of 2006—within weeks of the GHLT stock sale to Abellan's companies—defendants completed the second phase of the scheme.  Abellan and his companies successfully dumped their shares on an unsuspecting market after defendants hyped the stock in a publicity campaign using misleading promotional mailers and press releases containing false claims about the company.  By selling his shares after touting the stock, Abellan and his companies made more than $13 million in profits.  Abellan wired the illicit proceeds out of the United States to bank accounts in Andorra, a small principality between France and Spain.

4.     The Commission seeks a judgment against all defendants enjoining them from future

SEC V. ABELLAN, ET AL.
COMPLAINT
1
SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA  94104
(415) 705-2500

1  violations of the securities laws.  The Commission also requests that the Court require Abellan and

2  Hew-Len each to pay a civil penalty for their violations and that the judgment prohibit them from

3  participating in any future offerings of penny stock.  The Commission requests that the judgment bar

4  Hew-Len from serving in the future as an officer or director of any public company.  Finally, the

5  Commission requests that the judgment require all defendants and relief defendants to disgorge any

6  of the benefits they received from violations of the federal securities laws.

7  **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGMENT**

8       5.    The Commission brings this action pursuant to Sections 20(b) and 20(d) of the

9  Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and

10  21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

11       6.    This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the

12  Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange

13  Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

14       7.    Venue is proper in this district pursuant to Section 22 of the Securities Act [15 U.S.C.

15  § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  GHLT's principal place of business

16  is in the Western District of Washington, and Hew-Len resides in the Western District of

17  Washington.  Acts or transactions constituting violations of the federal securities laws occurred in

18  this district.

19       8.    Assignment to the Tacoma Division is appropriate pursuant to Local Civil Rule 5(e)

20  because acts and omissions giving rise to the Commission's claims occurred, among other places, in

21  Kitsap County.

22       9.    All defendants, directly or indirectly, made use of the means or instrumentalities of

23  interstate commerce, or of the mails, or of the facilities of a national securities exchange in

24  connection with the transaction, acts, practices, and courses of business alleged herein.

25  **DEFENDANTS**

26       10.    **Francisco Abellan**, also known as "Frank Abel," age 37, is a Spanish citizen and

27  resident of Barcelona, Spain.  A stock promoter, he buys and sells shares of small companies in the

28  United States.

SEC v. ABELLAN, ET AL.
COMPLAINT

2

SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA  94104
(415) 705-2500

11.     **Vega Star Capital, SL** is a Spanish venture capital and investment consulting company based in Barcelona, Spain.  Abellan is an officer and director of Vega Star and has an ownership interest in the company.

12.     **EU Equity Holdings Inc.** is a purported investment company incorporated in Panama in mid-2005.  Abellan has an ownership interest in the company.

13.     **KLO Financial Services Inc.** is a purported investment company incorporated in Panama in mid-2005.  Abellan has an ownership interest in the company.

14.     **Gene Hew-Len**, age 38, lives in Bremerton, Washington.  Hew-Len is President and CEO of NXGen Holdings, Inc., which was known as GHL Technologies, Inc. during 2005 and 2006.

15.     **NXGen Holdings, Inc.** was incorporated in Nevada in December 2005, with its principal place of business in Bremerton, Washington.  The company was previously known as **GHL Technologies, Inc.** and was an installer of Global Positioning System ("GPS") devices for commercial and emergency vehicles.  According to financial statements for fiscal year 2005, the company had net income of approximately $36,000 on revenue of approximately $606,000.  The company's stock began actively trading on the Pink Sheets on April 21, 2006, under the ticker symbol "GHLT."  The company was a "penny stock" issuer during the relevant period:  its shares traded for less than $5.00 per share and it met the other requirements of Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

**RELIEF DEFENDANTS**

16.     **Apollo Corporation** is named as a defendant in this action solely for the purpose of ensuring complete relief.  Defendant is a Dominican Republic company that holds an account at a financial institution in the principality of Andorra.  Abellan transferred illicit proceeds of the scheme described in this Complaint into the company's account.

17.     **D&O International Corp.** is named as a defendant in this action solely for the purpose of ensuring complete relief.  Defendant is a Panama company that holds an account at a financial institution in the principality of Andorra.  Abellan transferred illicit proceeds of the scheme described in this Complaint into the company's account.

SEC v. Abellan, et al.
Complaint

3

Securities and Exchange Commission
44 Montgomery Street, Suite 2600
San Francisco, CA  94104
(415) 705-2500

18.   **Halston Capital Ltd.** is named as a defendant in this action solely for the purpose of ensuring complete relief.  Defendant is a British Virgin Islands company that holds an account at a financial institution in the principality of Andorra.  Abellan transferred illicit proceeds of the scheme described in this Complaint into the company's account.

19.   **Insight Marketing & Communications Inc.** is named as a defendant in this action solely for the purpose of ensuring complete relief.  Defendant is a Panama company that holds an account at a financial institution in the principality of Andorra.  Abellan transferred illicit proceeds of the scheme described in this Complaint into the company's account.

20.   **Lacroix International Holdings Ltd.** is named as a defendant in this action solely for the purpose of ensuring complete relief.  Defendant is a British Virgin Islands company that holds an account at a financial institution in the principality of Andorra.  Abellan transferred illicit proceeds of the scheme described in this Complaint into the company's account.

21.   **Media Pacific Inc.** is named as a defendant in this action solely for the purpose of ensuring complete relief.  Defendant is a Panama company that holds an account at a financial institution in the principality of Andorra.  Abellan transferred illicit proceeds of the scheme described in this Complaint into the company's account.

22.   **Mortensen Financial Ltd.** is named as a defendant in this action solely for the purpose of ensuring complete relief.  Defendant is a Belize company that holds an account at a financial institution in the principality of Andorra.  Abellan transferred illicit proceeds of the scheme described in this Complaint into the company's account.

23.   **Omni Consulting Services Inc.** is named as a defendant in this action solely for the purpose of ensuring complete relief.  Defendant is a Panama company that holds an account at a financial institution in the principality of Andorra.  Abellan transferred illicit proceeds of the scheme described in this Complaint into the company's account.

SEC v. ABELLAN, ET AL.
COMPLAINT

4

SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA  94104
(415) 705-2500

## FACTUAL ALLEGATIONS

**A.**   **Hew-Len Forms GHL Technologies, Inc. and Obtains Stock Listing with Abellan's Assistance**

24.   In 2004, Gene Hew-Len incorporated Emergency Vehicles Installation, Inc. ("EVI") as a start-up company for installing and servicing GPS-based navigation and vehicle tracking equipment on commercial and government vehicles.  In June 2005, Hew-Len sought advice about how to take his company public and met Francisco Abellan.  Abellan offered to help Hew-Len turn EVI into a public company and to raise capital by finding investors for him.  Abellan advised Hew-Len through a series of steps to accomplish this plan, communicating frequently by e-mail and Web-based instant messaging.

25.   In October 2005, Abellan and Hew-Len executed an agreement to form a new company called GHL Technologies, Inc.  The stated purpose of the agreement was to transform the new company into a publicly-traded company quoted on the Pink Sheets, a marketplace for public trading of shares of primarily small companies that do not qualify to be listed on stock exchanges.  The agreement required GHLT, once formed, to issue seven million shares to "designees" of Abellan in exchange for the $500,000.  Abellan's company, Vega Star, agreed to pay GHLT $50,000 immediately, followed by additional payment to GHLT by "designees":  $250,000 upon GHLT's listing on the Pink Sheets, and $200,000 one month later.  The agreement did not provide for any form of compensation to Vega Star or Abellan; however, it obligated Abellan and Hew-Len to agree on the timing and content of all press releases from GHLT.

26.   In September 2005, Abellan referred Hew-Len to an attorney, who assisted Hew-Len to incorporate GHLT in Nevada as a "holding company" for the operating subsidiary, EVI.  Abellan then identified a shell company whose shares were quoted on the Pink Sheets.  At Abellan's direction, GHLT acquired the shell company and, as a result of the merger, shares of GHLT were quoted on the Pink Sheets.  Active trading in GHLT stock began on April 21, 2006.

SEC v. ABELLAN, ET AL.
COMPLAINT

5

SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA  94104
(415) 705-2500

**B.    At Abellan's Direction, Hew-Len and GHLT Offer and Sell GHLT Shares to Two Panamanian Investment Companies Owned by Abellan**

27.    At the same time that Abellan and Hew-Len were organizing GHLT in order to create a publicly-traded entity, they were also preparing a public offering of its stock.  In early 2006, Abellan informed Hew-Len that he had found two investors to participate in the offering:  EU Equity Holdings, Inc. and KLO Financial Services, Inc., both Panamanian investment companies.  Abellan had an ownership interest in both EU and KLO.

28.    On February 9, 2006, EU and KLO signed agreements in which each offered to purchase 3.5 million GHLT shares for $250,000.  In the subscription agreements, EU and KLO stated that they intended to acquire the GHLT shares "for investment, and not with a view to resale or distribution" to the public.  These representations by EU and KLO were necessary for the transaction to be considered a "private sale," exempt from public registration with the Commission.  The EU and KLO representations were false, however, and in fact Abellan was preparing to sell the shares to public.

29.    Hew-Len agreed on behalf of GHLT and authorized the issuance of the shares to EU and KLO.  Based on EU and KLO's false representations about their investment intent, Abellan and Hew-Len instructed GHLT's stock transfer agent to issue the shares to EU and KLO.

30.    The GHLT stock sale to EU and KLO was not registered with the Commission.  Had the transactions been registered, GHLT would have been required to provide important and detailed information about the company's business and finances to potential investors in the public marketplace.

31.    Within weeks, EU and KLO each assigned 500,000 shares of GHLT stock (one million shares total) to Abellan's company, Vega Star.  Abellan countersigned the respective agreements and Hew-Len received copies.

32.    On about March 22, 2006, GHLT's stock transfer agent electronically deposited a total of 5.8 million shares of GHLT stock into two separate brokerage accounts in Florida opened by Abellen for EU and KLO.  Abellan held the power of attorney over the EU and KLO accounts.  That same day, as contemplated by the agreements EU and KLO had with Vega Star, the GHLT stock

1  transfer agent also deposited one million shares into Vega Star's brokerage account with the same

2  Florida brokerage firm.

3        33.     In exchange for the GHLT shares, EU and KLO collectively paid GHLT $500,000

4  through a series of wire transfers in April and May 2006.  Out of those funds, Hew-Len personally

5  received $200,000 from GHLT.

6        **C.    Abellan, Vega Star, and Hew-Len Tout GHLT Stock**
          **in a Misleading Promotional Campaign**

7

8        34.     <u>The Misleading Mailer</u>:  In early April 2006, Abellan arranged for a mass mailing of

9  "The Street Stock Report," an eight-page, full-color, glossy promotional mailer touting GHLT stock.

10 Acting through Vega Star, Abellan hired the printer, prepared content for the mailer, provided the

11 destination addresses, and paid approximately $984,000 for printing and postage.  In an effort to keep

12 his involvement hidden, Abellan directed the printer to remove from the mailer and envelopes the

13 identity of the printing company, the origin of the mailing, his own name, Vega Star's name, and any

14 permanent addresses associated with him or his companies.  Abellan directed the printer to use a post

15 office box in Connecticut as a return address.  The mailer also referred to an associated publicly-

16 available Web site, TheStreetStockReport.com, which exclusively touted GHLT stock during the

17 relevant period.

18       35.     The mailer featured multiple pages of hyperbolic statements about GHLT and the

19 market for GPS technology, such as "GHLT STOCK COULD SEE A 500%-1000% PROFIT IN

20 THE COMING MONTHS!" and "GHLT needs to capture only 0.14% of this $757 billion market to

21 realize $1 BILLION IN REVENUE!"  The "recommendation" for GHLT stock was listed in multiple

22 places as a "STRONG BUY," and several statements urged investors to act quickly and buy the stock

23 "aggressively" in order to gain the highest returns.

24       36.     Among the glowing recommendations of GHLT stock, the mailer failed to state that

25 its creators and distributors—Abellan and Vega Star—owned shares of GHLT stock and that, at the

26 time of the mailer's distribution, they intended to sell the shares for a profit to the public.

27       37.     In small print, the mailer included a lengthy "disclaimer" designed to mislead

28 recipients and potential investors.  The disclaimer falsely stated that "TSSR [The Street Stock

1  Report] and its management fully disclose that they receive fees from profiled companies or agents

2  representing the profiled companies.  These fees may be paid in cash or in stock and they will be

3  fully disclosed in each profile. . . .  TSSR has been compensated twenty five thousand dollars for

4  coverage of GHL Technologies, Inc. by MG Marketing Enterprises, who paid one million and

5  seventy thousand dollars to distribute this mailer."  This statement was false:  It was Abellan, through

6  Vega Star, who paid for the mailer, not "MG Marketing Enterprises."

7        38.    In addition, the disclaimer falsely suggested that "The Street Stock Report" was an

8  independent company and did not disclose Abellan and Vega Star's involvement in the creation or

9  distribution of the mailer.  Finally, the disclaimer was misleading because it failed to state that the

10  actual creators and distributors of the mailer, Abellan and Vega Star, actually owned shares of GHLT

11  stock and had a present intent to sell the shares.

12        39.    Over a three-day period, from approximately May 16 to May 18, 2006, Abellan and

13  Vega Star caused the mailer to be sent by U.S. mail to 2.1 million addresses in the United States.

14        40.    At about the same time as Abellan and Vega Star created and distributed the

15  misleading mailer, Hew-Len prepared a coordinated series of press releases for GHLT.  In December

16  2005, Abellan urged Hew-Len to hire an investor relations consultant to assist with press releases and

17  a web designer to produce a GHLT Web site.  Hew-Len agreed and, at Abellan's direction, spent the

18  next few months preparing a series of press releases to be issued each week during a 45-day period.

19        41.    From about April 24 to about May 23, 2006, GHLT issued nine press releases over the

20  public wire services and posted them on its company Web site.  Three press releases, discussed

21  below, contain materially false statements concerning the scope of GHLT's contracts with major

22  customers.

23        42.    The False Trimble Press Release:  On May 15, 2006, Hew-Len issued a press release

24  on behalf of GHLT announcing a "new relationship" that its operating subsidiary, EVI, had entered

25  into with GPS technology manufacturer Trimble Navigation Ltd.  The release stated that the

26  agreement would "represent multi-million-dollar revenues for the company over the next several

27  years" and that "Trimble ... has indicated that it will refer as much installation business as EVI can

28  assume."

SEC v. ABELLAN, ET AL.
COMPLAINT
8
SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA  94104
(415) 705-2500

43.     The press release was false.  In reality, EVI had entered into two non-exclusive agreements more than eight months earlier that allowed EVI to conduct third-party sales and installation of Trimble products, but did not in any way obligate Trimble to refer any volume of business to EVI or otherwise ensure any revenue for EVI.  By the terms of the agreement, Trimble explicitly reserved rights to sell through competing vendors in the same region, as well as directly to customers.  Moreover, the sales agreement was terminable by either party without cause after a one-year term, and the installation agreement was terminable by either party without cause at any time. Hew-Len was aware of the terms of the Trimble agreements at the time he reviewed and approved the press release.

44.     In addition, Hew-Len was aware GHLT had provided Trimble with a draft of the press release before issuing it and Trimble refused to approve its contents.  Three days after GHLT issued the release, a Trimble executive sent an e-mail to Hew-Len reiterating Trimble's objection to the accuracy of the release and informing Hew-Len that it contained "a lot of misleading information." Trimble requested that GHLT remove the release from its Web site immediately, but GHLT did not do so.  On June 1, 2006, Trimble terminated its agreements with EVI as a result of the false press release.

45.     The False Titan America Press Release:  On May 17, 2006, Hew-Len issued a press release on behalf of GHLT announcing that its subsidiary EVI had begun servicing a "multi-year agreement with Titan America, a leading U.S. cement and building materials producer, whereby EVI will provide GPS installation and maintenance for all of Titan's fleet vehicles nationwide."

46.     The press release was false because the terms of EVI's agreement with Titan specified only a month-to-month contract that did not obligate Titan to use EVI, and it applied only to a small number of vehicles in Florida and Virginia.  Hew-Len was aware of the terms of the Titan agreement at the time he reviewed and approved the press release.

47.     After voicing its objections to Hew-Len about the misleading release, Titan issued its own press release on June 1, 2006 entitled "Titan America Denies Vendor Claim of Multi-Year Contract."  Titan's release explained that "the statements published by GHL Technologies are

SEC v. ABELLAN, ET AL.
COMPLAINT
9
SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA  94104
(415) 705-2500

1    inaccurate," and that the relevant agreement was in reality "a short-term, month-by-month contract

2    . . . for only a small portion of our fleet."

3         48.    Under pressure from Titan, on June 2, 2006, Hew-Len and GHLT posted a new press

4    release on its company Web site "clarifying" that EVI's agreement with Titan "is in its pilot phase,

5    not a multi-year contract, and does not include all of Titan's fleet vehicles nationwide."  GHLT

6    further admitted that its earlier release had been "erroneous."  Hew-Len did not issue the clarifying

7    release through the public wire services, however, nor did he remove the earlier false release from the

8    GHLT Web site.  On June 5, 2006, Titan terminated its agreement with EVI as a result of the false

9    press release.

10        49.    <u>The False CEMEX Press Release</u>:  On May 22, 2006, Hew-Len issued a press release

11   on behalf of GHLT entitled "EVI Selected to Provide Nationwide GPS Installation Services for

12   CEMEX USA."  The release stated that CEMEX "has selected EVI to provide GPS installation

13   services for CEMEX's U.S.-based fleet vehicles," and that under the terms of the agreement, "EVI

14   will equip CEMEX USA's domestic fleet vehicles,"  and referred to CEMEX's sizeable nationwide

15   presence as one of the largest cement companies in the United States.

16        50.    The press release was false because EVI's actual agreement with CEMEX was not

17   "nationwide"—the agreement only provided for EVI to complete installations in 257 vehicles in

18   North and South Carolina at a price of $300 per vehicle.  Like the Titan agreement, EVI's agreement

19   with CEMEX was month-to-month and could be terminated by CEMEX at any time without cause.

20   Hew-Len was aware of the terms of the CEMEX agreement at the time he reviewed and approved the

21   false press release.

22        **D.**    **As GHLT Share Price and Trading Volume Spike,**
             **Abellan Dumps His Shares**

23

24        51.    The misleading promotion of GHLT stock through Abellan's The Street Stock Report

25   mailer and Hew-Len's false press release campaign dramatically increased the share price and trading

26   volume of GHLT stock in May and June 2006.  In the two weeks prior to May 15, 2006, when

27   Abellan, Vega Star, Hew-Len, and GHLT commenced the promotional campaign, GHLT stock

28   traded at an average price of $1.83 per share with an average trading volume of 433,400 shares per

SEC v. ABELLAN, ET AL.
COMPLAINT

10

SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA  94104
(415) 705-2500

1   day.  In contrast, from May 15 to 23, 2006, after the campaign began, the average price of GHLT

2   stock climbed nearly 30 percent to $2.37 per share, and the average trading volume increased 1,438

3   percent to 6,664,600 shares per day.  On the most active trading day, May 22, 2006, GHLT's stock

4   price closed at $2.88 per share on volume of 21,498,100 shares.  GHLT's stock price continued to

5   increase in June 2006, reaching a high of $8.80 per share on or about June 19, 2006.  As of August

6   2008, the stock trades for less than one penny per share on minimal volume.

7        52.     On May 22, 2006, Abellan and Vega Star sold all one million GHLT shares that had

8   been deposited into Vega Star's Florida brokerage account, obtaining profits of $1,539,439.

9        53.     Using his power of attorney, Abellan placed the orders to sell GHLT stock in the

10  Florida brokerage accounts for EU and KLO.  In a series of sales beginning on March 22, 2006—the

11  day the stock was deposited in the accounts—to May 23, 2006, Abellan sold all of EU and KLO's 5.8

12  million GHLT shares.  EU and KLO's largest sales occurred on May 22, 2006, after the false press

13  releases and misleading promotional mailer had been disseminated and GHLT's stock price had risen

14  dramatically.  On that day, Abellan sold 1,092,225 shares in EU's account and 1,639,173 shares in

15  KLO's account.  As a result of their GHLT stock sales, EU obtained proceeds of $6,577,668 and

16  KLO obtained proceeds of $5,461,529.  After deducting the $500,000 that EU and KLO paid GHLT

17  for the stock, their collective profits totaled $11,539,197.

18       54.     The GHLT stock sold by Abellan through the Vega Star, EU, and KLO accounts was

19  purchased by public investors, which had no access to GHLT's true financial condition.  No

20  registration statement had been filed with the Commission on behalf of GHLT at the time of its stock

21  sales to EU and KLO or at the time of the subsequent sales in the public market.  Had the transactions

22  been registered, as required, GHLT would have been required to provide important and detailed

23  public disclosures about the company's business and finances.  Investors were harmed both by the

24  lack of information about GHLT, and by the false and misleading mailer and press releases issued by

25  Abellan, Vega Star, Hew-Len and GHLT.

26       55.     Within three days of their final sales of GHLT stock, Abellan wired all of Vega Star's,

27  EU's and KLO's profits from their Florida brokerage accounts to bank accounts in their names

28  located in Andorra, a small principality located between France and Spain.

SEC v. Abellan, et al.
Complaint

11

Securities and Exchange Commission
44 Montgomery Street, Suite 2600
San Francisco, CA  94104
(415) 705-2500

## FACTUAL ALLEGATIONS RELATING TO RELIEF DEFENDANTS

56.     Abellan subsequently transferred the GHLT stock sale proceeds out of the EU and KLO Andorran bank accounts into Andorran bank accounts, including accounts opened in the names of Apollo Corporation, D&O International Corp., Halston Capital Ltd., Insight Marketing & Communications Inc., Lacroix International Holdings Ltd., Media Pacific Inc., Mortensen Financial Ltd., and Omni Consulting Services Inc.  These entities received and possess money or other assets through defendants' fraudulent scheme and illegal sale of securities to the public, and have no legitimate claim to them.  Abellan has power of attorney over all of the accounts into which he transferred the proceeds, and an ownership interest in each of the entities in whose names the accounts are held.

### FIRST CLAIM FOR RELIEF
*(Violations of Securities Act Sections 5(a) and 5(c)*
*by All Defendants)*

57.     The Commission realleges and incorporates by reference paragraphs nos. 1 through 56.

58.     From June 2005 through July 2006, defendants Abellan, EU, KLO, Vega Star, Hew-Len, and GHLT, and each of them, directly or indirectly, by use of the means and instruments of transportation and communication in interstate commerce, and by use of the mails, offered to sell and sold certain securities as to which no registration statement was filed with the Commission and was in effect.

59.     Defendants Abellan, EU, KLO, Vega Star, Hew-Len, and GHLT, and each of them, by such conduct, violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and 15 U.S.C. § 77e(c)] and, unless restrained and enjoined, will continue to engage in such violations.

### SECOND CLAIM FOR RELIEF
*(Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder*
*by Defendants Abellan, Vega Star, Hew-Len, and GHLT)*

60.     The Commission realleges and incorporates by reference paragraphs nos. 1 through 56.

SEC v. ABELLAN, ET AL.
COMPLAINT

12

SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA  94104
(415) 705-2500

61.     By engaging in the conduct described above, Abellan, Vega Star, Hew-Len, and GHLT, and each of them, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

   a.  Employed devices, schemes, or artifices to defraud;

   b.  Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

   c.  Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

62.     By reason of the foregoing, Abellan, Vega Star, GHLT, and Hew-Len, and each of them, have violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Permanently enjoin defendants Abellan, EU, KLO, Vega Star, Hew-Len, and GHLT, and each of them, from directly or indirectly violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and 77e(c)].

### II.

Permanently enjoin Abellan, Vega Star, Hew-Len, and GHLT, and each of them, from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 U.S.C. § 240.10b-5].

### III.

Order Abellan and Hew-Len, and each of them, to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

SEC v. ABELLAN, ET AL.
COMPLAINT

13

SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA 94104
(415) 705-2500

1          IV.

2          Order Abellan, Vega Star, Hew-Len, EU and KLO, and each of them, to disgorge all benefits

3     that they obtained from their violations of the securities laws, with prejudgment interest.

4          V.

5          Order each of the relief defendants to disgorge the benefits that they obtained from

6     defendants' violations of the securities laws, with prejudgment interest.

7          VI.

8          Prohibit Hew-Len, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)],

9     from serving as an officer or director of any entity having a class of securities registered with the

10    Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file

11    reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

12         VII.

13         Pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], prohibit Abellan

14    and Hew-Len, and each of them, from participating in any offering of penny stock.

15         VIII.

16         Retain jurisdiction of this action in accordance with the principles of equity and the Federal

17    Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that

18    may be entered, or to entertain any suitable application or motion for additional relief within the

19    jurisdiction of this Court.

20

21

22

23

24

25

26

27

28

1

IX.

2          Grant such other and further relief as this Court may determine to be just and necessary.

3

4   Dated:                                   Respectfully submitted,

5

6
                                            _/S/ Lloyd A. Farnham_____
7                                           LLOYD A. FARNHAM

8                                           MARC J. FAGEL
                                            ROBERT L. TASHJIAN
9                                            tashjianr@sec.gov
                                            JENNIFER L. SCAFE
10                                            scafej@sec.gov
                                            LLOYD A. FARNHAM
11                                            farnhaml@sec.gov

12                                          Attorneys for Plaintiff
                                            SECURITIES AND EXCHANGE COMMISSION
13                                          44 Montgomery Street, Suite 2600
                                            San Francisco, California  94104
14                                          Telephone:  (415) 705-2500
                                            Facsimile:  (415) 705-2501

15

16

17

18

19

20

21

22

23

24

25

26

27

28