UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

v.

FRANCISCO ABELLAN, et al,

    Defendants.

CASE NO. C08-5502BHS

ORDER GRANTING
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

This matter comes before the Court on Plaintiff's unopposed motion for summary judgment (Dkt. 94). The Court has considered the pleadings filed in support of the motion and the remainder of the file, and Defendants not having filed opposition to the motion, hereby grants Plaintiff's motion for the reasons stated herein.

## I. PROCEDURAL HISTORY

On August 13, 2008, Plaintiff filed a complaint against Defendants. Dkt. 1. On August 14, 2008, Plaintiff filed an application for temporary restraining order ("TRO"). Dkt. 17. On August 14, 2008, this case was reassigned to the undersigned. Dkt. 22. On the same day, the undersigned granted the TRO. Dkt. 29. On September 11, 2008, the Court converted the TRO into a preliminary injunction. Dkt. 64. On October 14, 2009, Plaintiff filed a motion for summary judgment against Defendants. Dkt. 94. This motion is unopposed.

## II. FACTUAL BACKGROUND

The following is a synopsis of the uncontroverted facts, as provided by Plaintiff:

[B]eginning in late 2005 defendants illegally sold millions of shares of Bremerton-based defendant GHL Technologies, Inc. ("GHLT") to the public without any disclosure of the company's financial statements or details of its business operations. The scheme was orchestrated by defendant Francisco Abellan, a Spanish stock promoter, using foreign companies that he owns and controls, defendants EU Equity Holdings Inc. ("EU"), KLO Financial Services Inc. ("KLO"), and Vega Star Capital, SL ("Vega Star"). Abellan began the scheme by helping to reorganize GHLT and obtaining a public listing for its stock. At about the same time, GHLT's Chief Executive Officer, defendant Gene Hew-Len, caused the company to issue nearly seven million shares to Abellan's companies EU and KLO, which paid $500,000 in exchange for the shares. Defendants did not register the transaction by filing a "registration statement" with the Commission. Had defendants registered the transaction, GHLT would have been required to provide important and detailed public disclosures about the company's business and finances. Defendants evaded public disclosure by falsely claiming that the transaction was a private sale for longterm "investment purposes," supposedly exempt from registration. In fact, Abellan entered the transaction with a view to selling the shares quickly to an unsuspecting market.

In the spring of 2006, Abellan engaged in a fraudulent promotional campaign to tout GHLT stock to potential investors. Abellan, through his company Vega Star, paid for a promotional mailer to be sent to more than two million addresses in the United States within a three-day period in May 2006. In the mailer, Abellan touted GHLT stock as a "strong buy" but did not disclose that he actually owned shares of the stock or that he intended to sell his shares into the demand he created by the mailer. At the same time, Abellan helped devise a public relations plan for GHLT in which GHLT issued press releases containing claims about the company's contracts with major customers.

The share price and trading volume of GHLT stock rose dramatically upon release of Abellan's misleading mailer and GHLT's press release campaign. Shortly thereafter, Abellan (through EU, KLO and Vega Star) sold GHLT shares to the public for more than $13.5 million. Abellan wired all of the funds out of the United States to bank accounts in Andorra in late May 2006.

In late July 2008, Andorran authorities for the first time confirmed that GHLT stock sale proceeds had been wired to bank accounts in Andorra opened in the names of EU, KLO, and Vega Star. *See* Declaration of Tonia J. Tornatore ("Tornatore Decl.") (Docket No. 37) ¶¶ 3, 4. The Andorran authorities' information directly contradicted Abellan's sworn declaration that he submitted in support of his proposed pre-litigation settlement with the Commission. *See* Scafe Decl. ¶¶ 53-54 & Exs. 43, 44, 45. According to Andorran authorities, Abellan personally controlled the disposition of their GHLT proceeds: He transferred the proceeds out of the EU and KLO accounts into nine other accounts for which he has power of attorney, including an account held in the name of Vega Star. Tornatore Decl. ¶¶ 4-6. The entities whose names appear on the Andorran accounts—named in this action as Relief Defendants—are based in Central America and the Caribbean. *See* Tornatore Decl. ¶¶ 5-7.

On August 13, 2008, based on the evidence submitted by the Commission, the Court entered a Temporary Restraining Order. *See* Docket No. 29. Abellan and Vega Star waived service of the summons and complaint and filed answers. *See* Docket Nos. 45-46 (waivers), 74-75

ORDER - 2

(answers). The Court converted the Temporary Restraining Order into a Preliminary Injunction, which was entered on September 11, 2008. *See* Docket No. 64. Among other things, the Preliminary Injunction froze Abellan's assets in the United States and required him and the companies he controls to repatriate investor funds that he transferred overseas. *See* Prelim. Inj. §§ XI, XIII, XIV.

Abellan, EU, KLO, and Vega Star refused to comply with the Court's Order to repatriate investor funds. Declaration of Robert L. Tashjian (filed concurrently) ¶ 1. In October and December 2008, the Commission served requests for production of documents on Abellan and Vega Star. Id. ¶¶ 2-3. Both failed to respond. *Id.* Abellan, furthermore, failed to appear at his deposition noticed for March 20, 2009. *Id. ¶ 4.* As a result of defendants' refusal to comply with their discovery obligations, the Commission was unable to develop further facts showing Abellan's ownership and control over EU, KLO, Vega Star, and the Relief Defendants.

Upon the Commission's application, the Court signed a letter rogatory requesting that the Andorran judicial authorities require Abellan's banks to produce documents to the Commission relating to Abellan and his companies' accounts. *See* Letter Rogatory (Docket No. 26). The Commission retained counsel in Andorra to submit the Court's letter rogatory to the Andorran magistrate presiding over an investigation into Abellan's alleged money laundering activities in Andorra. Tashjian Decl. ¶ 5. Following lengthy consideration, the Andorran magistrate declined to order the banks to produce documents to the Commission. *Id.* & Exs. A, B (attaching Sept. 28, 2009, order and English translation).

Dkt. 94 at 1-11 (synopsis based on excerpts from brief).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if

there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.

However, when a party does not oppose a motion for summary judgment Local Rule 7(b)(2) is instructive. This rule provides: "If a party fails to file papers in opposition to a motion, such failure may be considered by the court as an admission that the motion has merit." Local Rule 7(b)(2). Here, Defendant has not opposed Plaintiff's motion for summary judgment (Dkt. 94). The Court finds it appropriate to apply Local Rule 7(b)(2) in this matter, which implies Plaintiff's motion is meritorious.

**B.      Plaintiff's Summary Judgment Motion**

      **1.      Allegations**

           **a.      Violation of the Securities Act**

Plaintiff argues that Defendants violated Sections 5(a) and 5(c) of the Securities Act. Dkt. 94 at 20. To establish a prima facie violation of Section 5, the SEC must establish that (1) no registration statement covering the securities in question was in effect; (2) the securities were sold; and (3) the sale was carried out by the use of interstate communication or transportation and the mails. *SEC. v. Continental Tobacco Co. of S.C.*, 463 F. 2d 137, 155-56 (5th Cir. 1972). Once those elements are established, the burden shifts to the party claiming the benefit of an exemption under Sections 3 or 4 to establish that a statutory exemption was in fact available. *See, e.g., SEC. v. North American*

*Research & Development Corp.*, 424 F. 2d 63, 71-72 (2d Cir. 1970); *Gilligan, Will & Co. v. SEC.*, 267 F. 2d 461, 466 (2d Cir. 1959).

Plaintiff correctly notes that:

> "Despite the use of the [statutory] term 'sell,' liability under § 5 is not confined only to the person who passes title to the security. Instead, courts have established the concept of 'participant' liability to bring within the confines of § 5 persons other than sellers who are responsible for the distribution of unregistered securities." *SEC v. Murphy*, 626 F.2d 633, 649-50 & 652 (9th Cir. 1980). Section 5 liability attaches to those who have a "significant role" in an unregistered sale—that is, if a person is a "necessary participant" and a "substantial factor" in the transaction. *SEC v. Phan*, 500 F.3d 895, 906 (9th Cir. 2007) (affirming Section 5 liability where defendant, among other things, directed his company's attorneys to draft contract for stock sale). A claim for a violation of Section 5 does not require proof that the defendant acted intentionally or with any other mental state. *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004); *SEC v. Current Fin. Servs., Inc.*, 100 F. Supp. 2d 1, 6 (D.D.C. 2000).

Dkt. 94 at 12.

The Court finds that Plaintiff met its burden of establishing a prima facie case that Defendants violated 5(a) and 5(c) of the Securities Act when they participated in the offer and sale of GHLT stock. *See* Dkt. 94 at 20-24 (extensively discussing the record against Defendants). The Court finds this to be the case because it is uncontroverted that (1) no registration statement was filed; (2) Defendants sold GHLT stock in a manner that resulted in public distribution; and (3) Defendants engaged in interstate commerce to carry out the alleged scheme. Based on this showing, the burden shifts to Defendants to show the availability of the statutory exemption. *See, e.g., North American Research & Development Corp.*, 424 F. 2d at 71-72; *Gilligan, Will & Co.*, 267 F. 2d at 466.

Because Defendants have not filed any opposing motion in this matter, the Court finds they have failed to meet their burden in showing such an exemption. Further, Defendants have also failed to meet their summary judgment burden. *See Celotex Corp.*, 477 U.S. at 323 (moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof). Therefore, the Court grants summary judgment in favor of Plaintiff on this issue.

### b. Violation of the Exchange Act

Plaintiff's second claim alleges that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by making false statements or omissions in connection with the offer or sale of securities. Dkt. 94 at 24. These antifraud provisions prohibit the making of material misstatements or omissions. *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001). In addition to alleging the falsity and materiality of a statement, the SEC must adequately allege scienter. *Id*. "A showing of scienter is an element of an enforcement action pursuant to the antifraud provisions of the Securities Acts." *SEC v. Rubera*, 350 F.3d 1084, 1094 (9th Cir. 2003) (citing *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980)). "Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Id.* (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)). "Scienter is satisfied by recklessness." *Dain Rauscher* (citing *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir.1990) (en banc)). "Reckless conduct is conduct that consists of a highly unreasonable act, or omission, that is an 'extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id.* (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977)). Recklessness can also be shown by establishing that a defendant failed to disclose that he or she was trading in stocks that he or she was recommending indirectly. *SEC v. Blavin* 760 F.2d 706, 712 (6th Cir. 1985) ("Blavin recklessly failed to disclose that he was trading in stocks that his newsletter recommended . . .").

Scienter is also evident where persons engage in "scalping." Scalping, a known practice whereby the owner of shares of a security recommends that security for investment and then immediately sells it at a profit upon the rise in the market price which follows the recommendation, constitutes fraud or deceit for purposes of establishing violation of the Exchange Act. *SEC v. Capital Gains Research Bureau, Inc.*, 374 U.S. 180, 181 (1963). Engaging in the well-known fraud of scalping is an "extreme

1  departure from the standard of ordinary care." *SEC v. Steadman*, 967 F.2d 636, 641
2  (D.D.C. 1992).

3  Here, Plaintiff alleges that Defendants created a fraudulent scheme whereby they (1) obtained significant blocks of GHLT stock without registering the transaction; (2) artificially inflated the stock price by engaging in a fraudulent promotional campaign in which they failed to disclose their intent to sell their holdings in GHLT; and then (4) dumped the stock on the unsuspecting public for substantial profits. *See, e.g.,* Dkt. 6, Scafe Decl. ¶¶ 18, 49 and Exs. 10, 25, 40; Dkt. 35, Declaration of Travis Bryant ("Bryant Decl.") ¶ 10 and Ex. 1.

Plaintiff further alleges that Defendants engaged in scalping. Specifically, Plaintiff alleges that Defendant Francisco Abellan ("Abellan") obtained the GHLT shares, recommended the security to the public, and then dumped his shares upon a spike in their value following the recommendation made through press releases. *Id*; *see also Capital Gains Research Bureau, Inc.*, 374 U.S. at 181 (discussing "scalping").

The Court is persuaded by the record that Defendants violated the Exchange Act, Sections 10(b) and 10b-5 thereunder. *See* Dkt. 94 at 24-27 (discussing extensively the record against Defendants). The Court also finds that Defendants, by failing to oppose Plaintiff's motion for summary judgment, have also failed to meet their burden on summary judgment to establish a question of fact. *See Celotex Corp.*, 477 U.S. at 323 (moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof). Therefore, the Court grants summary judgment in favor of the Plaintiff on this issue.

### 2. Relief Requested

#### a. Injunction From Future Securities Law Violations

Plaintiff requests that the Court permanently enjoin Abellan, EU, KLO, and Vega Star from future violations of Sections 5(a) and 5(c) of the Securities Act. Dkt. 94 at 28.

Plaintiff also requests that Abellan and Vega Star be enjoined permanently from violating Section 10(b) and Rule 10b-5 of the Exchange Act. *Id.*

The Court is empowered to enjoin future violations of securities law. *See* 15 U.S.C. §§ 77t(b) and 78u(d). To obtain a permanent injunction, the SEC bears the burden of showing "a reasonable likelihood of future violations of the securities laws." *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996) (quoting *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980)). The granting or denying of injunctive relief "rests within the sound discretion of the trial court." *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 465 (9th Cir. 1985) (citing *SEC v. Arthur Young & Co.*, 590 F.2d 785, 787 (9th Cir. 1979)). There is "[n]o per se rule requiring the issuance of an injunction upon the showing of [a] past violation," *Fehn*, 97 F.3d at 1295 (quoting *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir.), *cert. denied*, 439 U.S. 953 (1978)). However, as was explained in *Murphy*, "[t]he existence of past violations may give rise to an inference that there will be future violations; and the fact that the defendant is currently complying with the securities laws does not preclude an injunction." *Id.* (quoting 626 F.2d at 655).

The Ninth Circuit has stated the following with respect to predicting future violations:

> we must assess the totality of the circumstances surrounding the defendant and his violations, and we consider such factors as
> (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations.

*Id.* at 1295-1296 (quotations omitted).

Here, Plaintiff argues that the record against Abellan and his companies establishes the need for the permanent injunctions it has requested. *See* Dkt. 94 at 9-19 (discussing extensively the record against Defendants). Specifically, Abellan led a sophisticated scheme that side-stepped the registration provisions of the securities laws in an effort to manipulate demand for GHLT. *Id.* Abellan's well-planned, prolonged scheme deceived

the public and caused tangible financial harm to investors, which shows a high degree of scienter. *Id*; *see also Rubera*, 350 F.3d at 1094 (discussing scienter) (citing *Aaron*, 446 U.S. at 701-02). Abellan was also uncooperative with the SEC's investigation. *See* Dkt. 94 at 17-19 (discussing the relevant record against Abellan).

The Court finds that, on these facts, Plaintiff has sufficiently met its burden and orders Abellan, EU, KLO, and Vega Star permanently enjoined from future violations of Sections 5(a) and 5(c) of the Securities Act. The Court also, on these facts, orders Abellan and Vega Star permanently enjoined from violating Section 10(b) and Rule 10b-5 of the Exchange Act.

### b. Order Disgorgement of Ill-Gotten Gains

Plaintiff requests that the Court order Abellan and the defendant entities to disgorge all ill-gotten gains. Disgorgement is an equitable remedy that prevents unjust enrichment. *SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993). The *Rind* court stated:

> Disgorgement plays a central role in the enforcement of securities laws. The effective enforcement of the federal securities laws requires that the Commission be able to make violations unprofitable. The deterrent effect of a Commission enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits.

*Id*. at 1491 (quotations and citations omitted)

Plaintiff also requests, assuming the Court orders disgorgement, that Abellan and the defendant entities be held jointly and severally liable for the full amount of the profits. Dkt. 94 at 28. "[W]here two or more individuals collaborate or have a close relationship in engaging the violations of the securities laws, they have been held jointly and severally liable for the disgorgement of illegally obtained proceeds." *SEC v. First Pac. Bancorp*, 142 F.2d 1186, 1191-92 (9th Cir. 1998).

Here, the Court orders disgorgement consistent with the SEC's need for deterrent effect in enforcing securities violations. *Rind*, 991 F.2d at 1491. It also appears from the record that Abellan and the other defendant entities collaborated in the alleged scheme. *See* Dkt. 94 at 29 (discussing extensively the record against Defendants that favors

disgorgement and holding Abellan and the defendant entities jointly and severally liable). The Court finds Abellan and the defendant entities jointly and severally liable.

Therefore, to the extent Plaintiff's calculations are correct, the Court orders disgorgement in the amount of $15,403,703. *See* Tashjian Decl. ¶ 8 (expressing mathematical calculations for the amount to be disgorged).

### c. Civil Penalty Against Abellan

Plaintiff requests that the Court impose a significant civil monetary penalty on Abellan. However, while Plaintiff asks for a significant civil penalty to be levied upon Abellan, it does not make a request for any specific dollar amount. Under 15 U.S.C. §§ 77t(d) and 78u(d)(3), the Court is authorized to impose civil monetary penalties for violations of the securities laws. The civil penalty provisions are set out in three escalating tiers; the third tier is the most severe and is reserved for violations involving "fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement, . . . [which] directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d) and 78u(d)(3). Third-tier penalties "for each such violation *shall not exceed the greater of* . . . $100,000 for a natural person . . . or . . . the gross amount of pecuniary gain to such defendant as a result of the violation . . . ." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii) (emphasis added); *see also* 17 C.F.R. § 201.1003 and Table III (adjusting third-tier penalties from $100,000 to $120,000 for conduct by a natural person occurring in or after 2001).

Any civil penalty is to be determined by the Court "in the light of the facts and circumstances" of the particular case. 69 F. Supp. 2d at 17 (quoting 15 U.S.C. § 78u(d)(3)). Like a permanent injunction, civil penalties are imposed to deter the wrongdoer from similar violations in the future; therefore those same factors governing the imposition of a permanent injunction apply here. *See Alpha Telcom, Inc*., 187 F. Supp. 2d at 1263 (citing *Murphy*, 626 F.2d at 655). Courts look to the following general factors when imposing penalties:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*SEC v. Lybrand*, 281 F. Supp. 2d 726 (citations omitted).

As discussed above, Abellan's violations in this matter were exceptionally egregious. Abellan caused the public who bought the self-inflated GHLT stock millions of dollars in losses collectively. Abellan did not cooperate with the SEC's requests to repatriate ill-gotten gains, which was also in noncompliance with the Court's order to do so.

While the Court finds a civil penalty appropriate here, Plaintiff has requested only a "significant" civil penalty without specificity as to an amount (Dkt. 94 at 31). Therefore, the Court imposes a civil penalty of $480,000 on Abellan, which reflects the $120,000 penalty allowed under the statute, multiplied by the four violations, Sections 5(a) and 5(c) of the Securities Act and Sections 10(b) and 10b-5 of the Exchange Act. *See* 15 U.S.C. §§ 77t(d)(2)(c) and 78u(d)(3)(B)(iii) (authorizing the Court to impose such a civil penalty).

### d. Penny Stock Bar on Abellan

Plaintiff also requests that the Court bar Abellan from participating in any offering of penny stock. Dkt. 94 at 32. The Penny Stock Reform Act defines a penny stock as follows:

> (51) (A) The term 'penny stock' means any equity security other than a security that-
> (i) registered or approved for registration and traded on a national securities exchange that meets such criteria as the Commission shall prescribe by rule or regulation for purposes of this paragraph;
> (ii) authorized for quotation on an automated quotation system sponsored by a registered securities association, if such system (I) was established and in operation before January 1, 1990, and (II) meets such criteria as the Commission shall prescribe by rule or regulation for purposes of this paragraph;
> (iii) issued by an investment company registered under the Investment Company Act of 1940;

    (iv) excluded, on the basis of exceeding a minimum price, net tangible assets of the issuer, or other relevant criteria, from the definition of such term by rule or regulation which the Commission shall prescribe for purposes of this paragraph; or
    (v) exempted, in whole or in part, conditionally or unconditionally, from the definition of such term by rule, regulation, or order prescribed by the Commission.

15 U.S.C. § 78c51(A). Pursuant to 17 C.F.R. § 240.3a51-1, a penny stock must, inter alia, have a value less than $5 per share, not be a national market stock with a market value of listed securities greater than $50 million for 90 consecutive days, and have tangible net assets of less than $2,000,000.

Here, GHLT stock did not fit within the exceptions detailed above. *See* 15 U.S.C. § 78c51(A). GHLT's shares traded at less than $5 per share. Scafe Decl. ¶ 17 and Ex. 8 (reflects Bloomberg printout establishing the differential between GHLT stock trading before and after the fraud during the spring of 2006). The agreement between EVI, Hew-Len, and Vega Star states that "the parties intend to establish [GHLT] as a Nevada corporation to become a *publicly* traded vehicle" that will be the parent company to EVI and Vega Star, which it also intends will be publically traded on the "Pink Sheets®, LLC." Scafe Decl. ¶ 13 and Ex. 5 at 1. The Court concludes, based on these facts, that GHLT was a penny stock.

The Court "has broad equitable powers to fashion appropriate relief for violations of the federal securities laws, which include the power to order an officer and director bar." *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1193 (9th Cir. 1998). The Court is authorized by statute to impose an officer and director bar "if the person's conduct demonstrates substantial unfitness to serve as an officer or director." 15 U.S.C. § 78u(d)(2). "When deciding to impose [a penny stock] bar, the court looks at essentially the same factors that govern the imposition of an officer or director bar." *SEC v. Steadman*, 603 F.2d 1126, 1140 (5th Cir. 1979). The bar may be imposed conditionally or unconditionally, and permanently or for a period of time to be determined by the Court. *Id.*; *see also* 15 U.S.C. § 78u(d)(6)(A) (duration of penny stock bar is set at the discretion

of the court and may be permanent). Factors to consider when deciding whether a penny stock bar should be imposed include (1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur. *See First Pacific Bancorp*, 142 F.3d at 1193; *see also Steadman*, 603 F.2d at 1140 (treating penny stock bar analysis like officer and director bar analysis).

As discussed above, Abellan organized and carried out a prolonged scheme to defraud investors that involved a high degree of scienter and yielded over $13 million in ill-gotten gains. Abellan was involved in this scheme at the highest level and it was an exceptionally egregious violation of the underlying securities law. Therefore, based on the foregoing, the Court imposes a permanent penny stock bar on Abellan.

## IV. ORDER

Therefore, it is hereby **ORDERED** that Plaintiff's motion for summary judgment (Dkt. 33) is **GRANTED** as discussed herein.

DATED this 7th day of December, 2009.

BENJAMIN H. SETTLE
United States District Judge